UNITED STATES, Appellee

v

KENNETH E. BISTRAM, Basic Airman, U. S. Air Force, Appellant

11 USCMA 345, 29 CMR 161

No. 13,603

Decided March 25, 1960

*Lieutenant Colonel James L. Kilgore* and *Lieutenant Colonel Philip J. Williamson* were on the brief for Appellant, Accused.

*Colonel John F. Hannigan* and *Major Lawrence J. Gross* were on the brief for Appellee, United States.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convened at Misawa Air Base, Japan, convicted the accused of housebreaking (Charge I) and assault with a dangerous weapon (Charge II), and sentenced him to a bad-conduct discharge, total forfeitures, and confinement at hard labor for one year. The conviction was affirmed by the convening authority and a board of review. The case is now before us for consideration of whether the law officer erred to the prejudice of the accused by failing to instruct the court members on the effect of certain testimony by the accused in regard to Charge I.

At trial, the prosecution showed, and the accused admitted directly or by necessary implication, that in the early evening of March 17, 1959, he entered a closed warehouse by removing a window. He was found at the door of an inner office by Sergeant Kyzer, who had returned to the warehouse to do some work. Kyzer knew the accused, but did not immediately recognize him. When discovered, the accused rushed at Kyzer, and struck him a blow on the head with a metal object. Although stunned, Kyzer ran after the accused. In the illumination of an overhead light in another part of the warehouse, to which the accused had run, he recognized the accused. Eventually, he trapped the accused in a storage room in the warehouse. Informed that there was "no use in trying to get away," the accused emerged from his hiding place; he was wearing a car coat and gloves. The accused and Kyzer conversed briefly as follows:

> "Q. Would you relate the conversation between yourself and the accused in room 'J'?
>
> "A. When he came out around the bin, I asked him what he was doing in the warehouse, and the first thing he said he was sorry. He didn't know it was me, and I asked him then he said he came there to come around to the point of wanting to type up a Form 75, and I told him that wasn't an excuse, to come along with me. I was going to go to the Air Police. That was all, and then we left the building and came out door 'A'."

As they left the warehouse, the accused "took off in a run." Kyzer called the military police. Later that evening the accused was interrogated by an agent of the Office of Special Investigations. After advice as to his rights under Article 31 of the Uniform Code of Military

346

Justice, 10 USC § 831, he said that he "wasn't anywhere near the building."

The accused testified in his own behalf. His testimony is substantially to the following effect. He had been previously assigned to duty with the Air Force Weapons Account, which had charge of the warehouse, and, occasionally, in the course of his duties, he worked in the warehouse at night "to catch up" on his work. On those occasions he went to building 971 which was located near the warehouse and obtained a key from the Priority Section. A few weeks before the incident, however, he was assigned to the orderly room, where his duties consisted of "picking up paperwork from different places and delivering" it. On the evening in question he wanted to type a Form 75 (Airman's Proficiency Report). Although there were typewriters in the orderly room they were "fully occupied" during the day and "locked at night." He went to the warehouse to type the form. He knew that a key was available in building 971, where personnel were on duty, but he entered the warehouse by removing the window because he "was just in a hurry to do my typing." He had proceeded through the warehouse to the door of the inner office when he heard a noise behind him. His testimony continues:

"A. Yes, sir. I was standing up at door 'D', and I heard this noise behind me. I didn't know what it was. I turned around and saw this form of a man. I was scared, so I saw this here metal object, nail puller, sitting down alongside right on the box next to me, and I grabbed that and started running toward this figure. I got—I threw it, and just in the general direction to distract his attention, so I could get out of the building. I didn't want to hurt him or anything. I didn't know who he was or if he might have been there to harm me, so I just tried to distract his attention, so I could get out of the building.

. . . . .

"Q. Now, Airman Bistram, why did run towards this room here? What was your purpose in mind?

"A. To get out, sir."

The accused admitted he talked to Sergeant Kyzer after he was cornered in the storage room, and that the conversation was as related by the sergeant in his testimony. He did not deny he ran away as soon as he got outside the warehouse. The prosecution established that the accused was not authorized to be in the warehouse. However, the accused maintained he "thought . . . [he] had permission to be in" the warehouse, and he felt it was "all right" to enter in order to type his form. No Form 75's were kept in the office before which the accused was observed, and Sergeant Kyzer had "no recollection of anyone seeing or finding" any such form in the warehouse.

No instructions were given on the effect of the accused's testimony that he believed he had authority to enter the warehouse, and none were requested. However, on appeal before the board of review, the accused contended the omission of an instruction on mistake of fact in regard to the right to enter was prejudicial error. The board of review held that the accused's testimony was "inherently improbable," and, accordingly, raised no issue of honest mistake requiring an instruction by the law officer.

Aside from whether a belief in the possession of authority to enter the premises of another must be honest and reasonable (Cf. United States v Holder, 7 USCMA 213, 22 CMR 3; United States v Jones, 7 USCMA 83, 21 CMR 209), it is well-settled that an instruction on a defense theory is required only if "the record of trial contains sufficient credible evidence raising an issue for the court-martial's consideration." United States v Farris, 9 USCMA 499, 26 CMR 279. The accused's contention that he believed he had authority to enter the warehouse is so inconsistent with his actions as to stamp the claim as inherently unbelievable. Without restating all the evidence, suffice it to say it is wholly incredible that one who believes he has authority to be where he is would, in order to get away from the place, strike another over the head with an iron bar without explanation or warn-

**347**

ing; that he would, when his egress is blocked, conceal himself in a storage room and emerge from concealment only when informed that he is known; that he would then engage in a conversation with a person known to him as one in authority in the premises, but when asked to accompany that person, flee from the scene and later deny he was present thereat. Under this record, the law officer was not required to give a separate instruction on the effect of an alleged belief that the accused possessed authority to enter the warehouse. See United States v St. Pierre, 3 USCMA 33, 11 CMR 33.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

FERGUSON, Judge (dissenting):

I dissent.

While this case turns upon the holding that this accused's testimony is incredible and, hence, establishes no precedent, its rejection of a perfectly plausible explanation requires that I express my disagreement with the conclusion of my brothers that the evidence raises no issue of mistake of fact.

The accused was found guilty of housebreaking, in violation of the Uniform Code of Military Justice, Article 130, 10 USC § 930, and assault with a dangerous weapon, in violation of Code, supra, Article 128, 10 USC § 928. He was sentenced to bad-conduct discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year. Intermediate appellate authorities affirmed, and we granted review on the single issue whether the evidence raised an issue of mistake of fact concerning the accused's authority to enter the structure involved in the housebreaking charge.

Accused was assigned to the 6139th Supply Squadron, Misawa Air Base, Japan. His duties, previous to March 17, 1959, had involved working in Building 964, a warehouse which also contained offices. However, by that date, he had been reassigned to a position in the unit orderly room, although he technically continued to be a member of the detachment responsible for the Building 964 supply account.

During the early evening hours of March 17, 1959, a Sergeant Kyzer returned to Building 964 in order to work on some of the projects assigned him. He unlocked the door and proceeded into the warehouse. He observed a "figure" near his office door. The "figure" seemingly saw him at the same time and said, " 'Oh', like a scared 'oh'." He "charged" Sergeant Kyzer and struck him on the head with an object. The "figure" then ran through the warehouse, throwing the object into the air. Kyzer pursued him, finally recognizing him as the accused. He yelled at accused several times and eventually cornered him in the warehouse's storage area. Accused was dressed in civilian clothes and, according to Kyzer, wore black cotton gloves. He informed Kyzer that he had not recognized him, apologized for his conduct, and stated that he had entered the warehouse "to type up a Form 75." Kyzer told accused to come with him, and they left the building. Outside, the accused begged him to overlook the incident and then ran away.

Later inspection of the premises disclosed that a window, which had been secured with nails because of a broken lock, had been removed from its frame. The "object" with which accused struck Kyzer was identified as a large metal crank.

Following the close of the prosecution's case, the accused elected to testify in his own behalf. He related that he had visited the warehouse in order to type a "Form 75." Finding the door locked, he removed the window and entered the building. He was aware of the window's condition as a result of having previously worked in the warehouse. He proceeded to Sergeant Kyzer's office and found the door locked. Hearing a noise, he turned and saw "this form of a man." He became frightened and picked up a nail puller. He ran toward the man and "threw it, and just in the general direction to distract his attention, so I could get out of the building." Thereafter, he fled through the warehouse until he was apprehended by Sergeant Kyzer. At all times, he thought it was proper for him

**348**

to enter the warehouse, as he was a member of the Supply Squadron and still assigned to the account for which it was used. Moreover, he had previously worked at night in the building, and he could not use the typewriters in the orderly room as they were locked at night. He did not obtain the key to the warehouse on the night in question because "I was just in a hurry to do my typing, so I knew the window was open, because I worked there, so I could go in through the window."

Accused also stated he was wearing regulation service gloves, but admitted he had falsely advised an Air Force investigator that he had not been near the warehouse on March 17.

Other witnesses testified the accused would have been granted permission to enter the warehouse if he had "a reason," although one stated that he would not have been permitted to go there alone.

My brothers and I are in agreement on the test to be used in determining whether an issue is raised concerning the affirmative defense of mistake of fact. The rod by which we measure is simply whether the record contains credible evidence indicating accused's honest error concerning his authority to enter the premises involved. United States v Farris, 9 USCMA 499, 26 CMR 279; United States v Morphis, 7 USCMA 748, 23 CMR 212; United States v Swain, 8 USCMA 387, 24 CMR 197; Note, 58 Chronicle Letter 15/2 (1958). They find the accused's testimony, however, incredible in view of his actions on the scene. From this characterization of the record, I must dissent.

Initially, it must be noted that Sergeant Kyzer, the victim of the assault, indicated that the lighting in the warehouse was so poor he was not able to identify the accused until some time after his flight had commenced. This tends to support the accused's declaration that he did not recognize Kyzer until he was called upon to come out and surrender. Moreover, it is not incredible that a young airman, hearing an unexpected noise at night in a large and darkened warehouse and observing an unidentifiable figure, might become frightened, throw a heavy object, and take refuge in immediate flight. It is equally believable that, after plunging headlong through the storage areas, he would seek to hide from his pursuer until he was made aware of the latter's identity. Indeed, that knowledge brought little relief, for with it must have come the sickening realization that he had struck a superior noncommissioned officer with a heavy bar. Certainly, there was nothing in the situation to calm accused's fears, and, understandably, he again departed when it became clear that Kyzer was quite properly bent upon taking him to Air Police headquarters. Finally, following his subsequent apprehension, there was little to be gained by an admission to criminal investigators of his presence in Building 964, and his denial to them of Kyzer's accusation has no greater effect than to impeach his credibility. In short, it is clear that the accused, whose testimony candidly admitted his faults and its inconsistency with his pretrial statement, presented a tale which cannot, as a matter of law, be deemed unbelievable.

My conclusion, of course, does not at all imply that the members of a court-martial would be required to accept accused's story as true. It has obvious defects. For example, although Kyzer discovered him at the door of his office rather than in the warehouse storage area—the place in which a thief might normally search for loot—he noticed no Form 75 in accused's hand, nor was one later displayed. However, it is equally clear that many factors tend to support his version. These involve his immediate, consistent statement to Kyzer of his purpose in being in the warehouse; the agreement of the witnesses that he would have probably been granted permission to go there had he applied for it; the fact that he belonged to its parent organization; and the unrebutted assertion that he had previously worked there at night.

Lastly, those familiar with the average soldier will recognize the reasonableness of accused's explanation of his unusual method of entry into the warehouse. Many persons, confronted with a locked door, might be tempted to enter through a nearby window which they

knew to be unlocked, and it is illogical to believe that all reasonable men would have rejected that explanation. Compare our holding in United States v Swain, supra, concerning the effect of an accused's denial of the intent to desert when he had remained absent without leave for twelve years.

These considerations convince me the accused's story is not so inherently improbable that it did not serve to raise an issue of mistake of fact concerning his authority to be in the warehouse. The truthfulness of his explanation concerning the entry and the subsequent events was a question for the members of the court-martial under proper instructions. When my brothers hold the contrary, I suspect they are unduly affected by the thought that they, as fact finders, would reject the defense testimony. As an appellate body, however, we must measure the evidence by a different standard. United States v Farris, supra; United States v Swain, supra. Its application, in my opinion, requires that we hold the accused's testimony sufficiently credible to raise the issue in question. Accordingly, and in light of the instructional deficiency, I must register my disagreement with the majority's affirmance of the findings of guilty.

I would reverse the decision of the board of review insofar as it relates to accused's conviction of housebreaking and return the record of trial for direction of a rehearing or reassessment of the sentence on the basis of the other Charge.